By the Court, Bronson, J.
By the charter, the stockholders are made, jointly and severally, personally liable for the payment of the debts of the corporation; (Stat. of 1837, p. 445, §§ 9, 10;) and under a like provision in relation to the Rossie Lead Mining Company we held that the liability was upon those who were stockholders at the time the debt was contracted. (Moss v. Oakley, 2 Hill, 265.) So far as any question appears to have been made on the trial, the plaintiff’s debt, was contracted at the time the note bears date, which is January 16th, 1840. At that time the names of the defendants stood on the books of the company as the owners of six shares of the stock, though they had previously ceased to have any thing more than the formal title. The debt for the security of which they held the stock was fully paid in 1838, and the scrip or certificate was returned to Bush, with an informal power to re-transfer the stock. On learning that the authority was defective, the defendants executed another and a sufficient power in De-. cember, 1839; but the transfer was not actually made until after the plaintiff’s debt was contracted.
Before the notes of Nash & Co. were paid, I cannot doubt that the defendants were stockholders within the meaning of the statute, and answerable as such to the creditors of the company. They did riot receive the stock as a pawn or pledge ; for the whole legal interest was vested in them, and they might sell and transfer the property at pleasure. They not only stood as owners on the books of the company, where by the charter the stock was made transferable; (§ 7;) but they had the usual evidence of ownership in a certificate signed by the president and secretary of the corporation. If we could look beyond the legal title, and notice the equitable interest, 'the case would not be materially changed. By the receipt which the defendants gave to Bush, they had the right to dispose of the stock at any time; though before the notes of Nash & Co. fell due, they were restricted to a particular price. After the notes became due, they could sell at the market value. I may add, that they held the stock for a sum which greatly exceeded both its nominal and actual value. But it is enough that they clearly had *627 the legal title to the stock, which they took, so far as third persons are concerned, with all the rights, and subject to all the liabilities, which that title could confer or impose.
After the notes of Nash & Co. had been paid, and the defendants had given a power to re-transfer the stock to Bush, the question is one of more apparent difficulty. But it will, I think, be found that the difficulty arises mainly from the increased hardship of the case. The nature of the question is not changed, so far as a court of law is called upon to deal with it. I have already, said that this was not a pawn or pledge of the stock. Neither was it strictly a mortgage. The conveyance was not made upon condition to become void on payment of the debt. It was absolute: and a re-transfer was necessary to change the title. The most usual mode of pledging or hypothecating this species of property is, to make an assignment with a power to transfer in case the debt is not paid; or to give a power to sell and transfer in the same event, without any formal assignment. In either case, the title is not changed until the transfer is actually made. Although the mortgagee or pledgee has a qualified property, the legal interest remains in the original holder, who is entitled to all the privileges, and subject to all the responsibilities of a stockholder; except so far as those privileges and responsibilities may be affected by legislation. Here the transfer was actually made, and the defendants had all the muniments of a perfect title. Bush had ceased to be a stockholder, and the defendants had taken his place.
It is said that after the notes were paid, the equitable title to the property was in Bush. There is some difficulty in maintaining that position; for by the terms of the receipt the defendants had the option to return or account for the stock. But if the equitable interest was in Bush, the legal title still remained in the defendants. They might receive dividends, vote at elections, and enjoy all the other rights pertaining to the ownership of the property; and with the privileges, they must take the burdens of a stockholder. True, they would be answerable to Bush as trusteesbut that cannot affect their rights or duties in respect to third persons. This is a peculiar kind of property. *628 The legislature has provided for the creation of the “ stock,” prescribed the mode in which it may be transferred, and conferred certain rights and liabilities upon the “ stockholders.” After the defendants had once become the legal owners, they could only throw off the liabilities incident to that relation by transferring the stock. Until that was done, they continued to "be “ stockholders” within the meaning of the statute. If we depart from, the terms of the law, and inquire into the equities which may exist between the stockholder and some third person, it cannot fail to embarrass creditors in seeking a remedy for the wrongs which may be done by the corporation. ' If creditors must look beyond the legal title, they can never know against whom to proceed. If the stock has been fraudulently transferred for the purpose of avoiding responsibility, and at the same time securing all the advantages of a stockholder, I-do not intend to say that the real owner cannot be reached.(a) Fraud vitiates every thing. But where there is nothing but an honest trust, I think the rights of the creditor will be most effectually secured, and the policy of the law most fully carried out, by looking to the legal ownership of the property. There should be no exception to the rule, unless the existence of the trust appears upon the face of the usual evidences of ownership.
If on receiving payment of the notes, the defendants had assigned the stock to Bush, it is possible that this action could not have been maintained. The assignment, as between the parties tó it, would have passed the legal interest in the stock, although no transfer had been made upon the books of the company. (Bank of Utica v. Smalley, 2 Cowen, 770.) But the defendants made no conveyance. They only gave a power to transfer; and until the transfer was actually made, they continued to be the legal “ stockholders.” They might have voted at elections, and received dividends; and they must answer to the creditors of the corporation.
*629 It seems to have been thought a matter of some moment that the plaintiff, so far as appeared on the trial, had not examined the stock ledger before he gave credit to the company. But there are other ways in which he may have learned that the defendants were stockholders. " And besides, I do not see that the liability of the stockholder has been made to depend on the fact that the creditor knew he could be reached. A man may so conduct as to render himself liable to third persons as the member of a partnership, although he had no real interest in the business. But if he is in fact a partner, the manner in which he has conducted is a matter of no moment: nor is it important to inquire whether the creditor knew of the partnership at the time he parted with his property. So here, as the defendants were in fact stockholders, they must answer to the plaintiff, although he may not have known at the time he trusted the company that the defendants could be reached.
This is undoubtedly a hard case for the defendants. But many others are in the same unfortunate condition. Any law which transfers the debts of a broken corporation to the shoulders of the stockholder, will always punish some who are innocent for the transgression of others. Men must look to that before they become interested in such a company, either by contributing funds in the first instance, or by purchasing stock from the original corporators.
New trial granted.

 See Marcy v. Clark, (17 Mass. Rep. 330;) and Moss v. Oakley, (2 Hill, 265, 271.)